UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES,** : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action |
| : | No. 99-1875 (GK) |
| **CARGILL, INCORPORATED and** : | |
| **CONTINENTAL GRAIN COMPANY,** : | **FILED** |
| : | |
| Defendants. : | **JUN 3 0 2000** |
| : | NANCY MAYER WHITTINGTON, CLERK |
| | U.S. DISTRICT COURT |

## MEMORANDUM OPINION

This matter comes before the Court on the Motion by the United States for Entry of Final Judgment [#22]. Upon consideration of the motion, the public comments filed in response to the proposed final judgment, and the United States' report, for the reasons stated below, the motion shall be granted, and the Final Judgment shall be entered.

### I.  Background

This litigation began when Cargill, Inc., attempted to acquire certain branches of Continental Grain Company's grain business. Both companies trade grain, and they do so by purchasing it from farmers, shipping it to specific locations using various grain elevators (country elevators, rail terminals, river elevators, and port elevators), and storing it until they can sell it and move it to their domestic and foreign customers.  Grain typically moves from farms to country elevators, then to river elevators and rail

terminals, and then to domestic purchasers or port elevators for export to foreign purchasers. Cargill and Continental often compete with each other at various stages of this grain distribution network, and both companies are players in the U.S. and foreign markets for grain.

On October 9, 1998, Cargill entered into an agreement with Continental to acquire Continental's grain trading business. On July 8, 1999, the United States filed a complaint alleging that the proposed acquisition would substantially lessen competition for grain purchasing services in nine relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The United States alleged that in those markets Cargill would have gained the power to artificially depress prices paid to U.S. farmers and other suppliers for their grain crops. The United States also alleged that the proposed acquisition was a division of markets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, because the agreement prohibited Continental from re-entering the grain business for a period of five years. This five-year period would give Cargill more than enough time to gain the loyalty of former Continental customers, thus making it very difficult for Continental to regain their loyalty if it chose to re-enter the market.

The proposed settlement focuses on the nine relevant markets where the effects of the acquisition would be felt the most. The settlement requires Cargill to divest either its grain elevator or Continental's grain elevator serving each market. In addition,

Cargill must make 1/3 of the daily loading capacity at its Havana, IL, river elevator available to an independent grain company to avoid undue concentration among firms controlling delivery points. The settlement prohibits Cargill from acquiring any interest in facilities to be divested by Continental pursuant to the settlement, and prohibits Cargill from reacquiring a formerly-held minority interest in another river elevator.  Finally, the proposed settlement reduces to three years the length of time that Continental must wait before re-entering the grain business and competing with Cargill.

**II.  Analysis**

The parties have thus far been in compliance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.  The Complaint and proposed Final Judgment were filed July 8, 1999. Defendants filed statements pursuant to 15 U.S.C. § 16(g) on July 19, 1999.  The Competitive Impact Statement ("CIS") was filed on July 23, 1999.  The proposed Final Judgment and CIS were published in the Federal Register on August 12, 1999, at 64 Fed. Reg. 44,046. A summary of the terms of the proposed Final Judgment and CIS was published in the Washington Post, a newspaper of general circulation in the District of Columbia, for seven days, from August 10, 1999 through August 16, 1999.  The sixty-day comment period specified in 15 U.S.C. § 16(b) ran from August 12, 1999 through October 12, 1999, during which the Department of Justice ("DOJ") received public comments regarding the proposed Final Judgment and the CIS.  DOJ filed the comments and its report on the

comments with this court on February 14, 2000, pursuant to 15 U.S.C. § 16(b), and published the comments and its report in the Federal Register on March 24, 2000, at 65 Fed. Reg. 15,981. The United States now moves for entry of the Final Judgment.

The Court may enter Final Judgment in this matter only after it determines that doing so serves the public interest. 15 U.S.C. § 16(e). The legal standard for the Court's public interest determination is a deferential one, allowing the Court to withhold its approval only under very limited conditions. United States v. American Tel. & Tel. Co., 552 F. Supp. 131, 151 (D.D.C. 1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001 (1983). The Court may not withhold its approval simply because the proposed Final Judgment does not contain the relief the Court itself might have awarded after a trial on the merits resulting in a finding of liability. Moreover, the Court must confine its review of the proposed Final Judgment to the violations charged in the complaint. Approval should be withheld only if: (a) any of the terms appear ambiguous; (b) the enforcement mechanism is inadequate; (c) third parties will be positively injured; or (d) the decree otherwise makes "a mockery of judicial power." Massachusetts Sch. Of Law at Andover, Inc. v. United States, 118 F.3d 776, 783 (D.C. Cir. 1997)(quoting United States v. Microsoft Corp., 56 F.3d 1448 (D.C. Cir. 1995)).

Cargill and Continental Grain are involved in the grain business in four main ways: selling standard grades of grain, selling less widely-traded grain products (niche products, etc.),

buying grain, and providing elevator services. The United States found that there would be no significant market power created as to the first two aspects of this business, because the combined market share of Cargill and Continental would be less than 8% of the sale of standard grain products, and a negligible percentage of the sale of so-called "niche" products. It is the second two aspects of this business (buying grain and providing elevator services) that are at issue in this litigation.

Cargill and Continental compete for the purchase of grain in relatively small local and regional markets. Because shipping grain by trucks is expensive, most farmers use trucks only for short distances, and sell their grain to buyers such as Cargill and Continental, who can ship it greater distances, and ultimately sell it. In nine local or regional markets, Cargill's acquisition of Continental could create sufficient market power to enable the few grain companies competing in these markets to depress grain prices.

To remedy this situation, the proposed Final Judgment requires Cargill to divest either its elevator or Continental's elevator in those relevant markets to a new entrant in the industry. The United States must approve all divestitures, after investigating the potential purchaser. Cargill has complied, or is in the process of complying, with this requirement.

The other aspect of the two companies' business that is of concern in this litigation (providing elevator services) is also addressed by the proposed Final Judgment. If Cargill's original acquisition of Continental had gone forward, Cargill and one other

company would hold approximately 80% of the authorized delivery services (various types of grain elevators) in the local or regional markets in question. This situation would make it easy for Cargill to unilaterally, or in coordination with the remaining firms, manipulate corn and soybean futures contracts. To remedy this situation, the proposed Final Judgment requires Cargill's divestiture of various river and port elevators, again with DOJ's approval after investigation of the potential purchaser.

The proposed Final Judgment addresses competitive concerns that arose from the way the original acquisition was structured. The divestitures would preserve competition in the nine relevant markets, and allow new entrants into the industry an opportunity to compete with the existing companies. In addition, shortening the non-compete provision in the acquisition from five to three years ensures that Continental may re-enter the grain business sooner, giving it a fair opportunity to regain the loyalty of former Continental suppliers and customers.

The vast majority of those who submitted public comments in response to the proposed Final Judgment were concerned that the proposed settlement did not go far enough in ensuring competition. It is not, however, this Court's task to fashion the most desirable settlement possible. Rather, the Court must approve the settlement unless any of the terms appear ambiguous, the enforcement mechanism is inadequate, third parties will be positively injured, or the settlement otherwise makes "a mockery of judicial power." The proposed Final Judgment does not raise any of these concerns, but

is instead a fair and reasonable resolution of the matter. Several specific issues will, however, be addressed below.

Several commentators expressed concern that the United States' definition of the relevant markets was too narrow, as the United States considered only local and regional markets. If, however, the United States had broadened its definition of markets to include national or international markets, it would have been forced to conclude that the proposed merger would not likely have lessened competition, since Cargill has a much smaller share of the national and international markets than it does of the local and regional markets in question.

Another concern was that after the merger, Cargill will have the ability to depress the prices it pays to farmers, who are a large and disorganized group of sellers, unable to assert any real control over the price they are paid for their grain. The proposed Final Judgment, however, requires the divestiture of certain of Cargill's operations, the effect of which is to protect farmers from having to accept artificially low prices for their grain from Cargill.

Some commentators expressed concern that the proposed Final Judgment does not address the problem of vertical integration in the agribusiness. Vertical integration occurs when several stages of production (producing, processing, distributing, and marketing) are brought together in one company. Vertical integration concerns are not implicated here because the proposed merger is horizontal rather than vertical.

Some commentators expressed concern that there is no assurance that the divested operations will remain competitive forces in the relevant markets. The United States has, however, reviewed the proposed agreements to ensure that the divested facilities will be controlled by new entrants with the appropriate background, experience, and incentive to make them viable and competitive.

Some commentators noted that the United States failed to explain the benefits of the merger. The Clayton and Sherman Acts do not, however, require the United States to make that judgment. The role the United States plays in such situations is to determine whether the merger is substantially likely to lessen competition, and if so, to seek to prohibit the transaction, or attempt to restructure it (by consent of the parties) to lessen that anti-competitive effect. The United States has fulfilled this role in the instant case.

Some commentators noted that the United States failed to consider several other statutes when structuring the proposed Final Judgment. These commentators have, however, failed to indicate how the statutes to which they refer affect the instant case, or how the proposed Final Judgment fails to address the problems those statutes were intended to cover.

Some commentators expressed concern that the United States failed to consider the possibility of continuing anti-competitive behavior by Cargill after the merger, and the effect of the removal of Continental as a competitor of Cargill. The proposed Final Judgment, however, sufficiently addresses these concerns by

requiring divestiture of certain of Cargill's operations to firms that will remain viable and competitive in the relevant markets.

In sum, because none of the terms in the proposed Final Judgment appear ambiguous, because the enforcement mechanism appears adequate, because no third parties will be positively injured, and because the settlement does not otherwise make "a mockery of judicial power," the Final Judgment shall be approved.

### III. Conclusion

Because this Court determines that entry of the Final Judgment is in the public interest, the Motion by the United States for Entry of Final Judgment [#22] shall be **granted**, and the Final Judgment shall be entered.

June 29, 2000
Date

GLADYS KESSLER
United States District Judge

**Copies to:**

Robert L. McGeorge
U.S. Department of Justice
Antitrust Division
325 7th Street, NW, Suite 500
Washington, DC  20530

David J. Butler
Swidler, Berlin, Shereff & Friedman, L.L.P.
3000 K Street, NW
Washington, DC 20007-5116

Marc Gary Schildkraut
Howrey & Simon
1299 Pennsylvania Avenue,
Washington, DC 20004-2402