IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**          ) <br> **Plaintiff,**          ) <br>          ) <br> v.          ) <br>          ) <br> **CARGILL, INCORPORATED and**          ) <br> **CONTINENTAL GRAIN COMPANY,**          ) <br> **Defendants.**          ) <br>          ) | Civil No. 99-1875 (GK) <br><br> **FILED** <br><br> JUN 3 0 2000 <br><br> NANCY MAYER WHITTINGTON, CLERK <br> U.S. DISTRICT COURT |

## FINAL JUDGMENT

WHEREAS plaintiff, the United States of America (hereinafter "United States"), having filed its Complaint herein, and defendants Cargill, Incorporated ("Cargill") and Continental Grain Company ("Continental"), by their respective attorneys, having consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without this Final Judgment constituting any evidence against or an admission by any party with respect to any issue of law or fact herein,

AND WHEREAS, the defendants have agreed to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, prompt and certain divestiture of certain assets to third parties is the essence of this agreement;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made as provided in this Final Judgment and that defendants will later raise no claims of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW, THEREFORE, before the taking of any testimony, and without trial or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.

## JURISDICTION

This Court has jurisdiction over the subject matter of this action and over each of the parties hereto. The Complaint states a claim upon which relief may be granted against the defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II.

## DEFINITIONS

As used in this Final Judgment:

A.   "Acquirer" means the person or persons to whom defendants shall transfer the Assets (as defined in subsection B).

B.   "Assets" means all property rights held by Cargill or Continental in the river, rail and port elevators defined in subsections C, F, H, J, L, M, Q, R, T and V.

C.   "Beaumont port elevator" means the port elevator operated by Continental at or near Beaumont, Texas, and all Related Assets.

   D    "Capacity" when used in connection with a grain elevator may be based on the maximum number of bushels that can be stored in the facility at any one time (storage capacity), or the maximum number of bushels that can be moved through the facility over the course of a designated unit of time (throughput capacity). When one grain company obtains the right to a certain percentage of the capacity of the storage or loading capacity at another grain company's elevator pursuant to a throughput agreement or other commercial arrangement, it obtains the right to the stipulated portion of total storage or throughput capacity at the facility, and not necessarily the exclusive right to use a specific area in that facility.

   E.   "Cargill" means defendant Cargill, Incorporated, and includes its successors and assigns, their subsidiaries, divisions, groups, partnerships and joint ventures, affiliates, directors, officers, managers, agents and employees.

   F.   "Caruthersville river elevator" means the river elevator operated by Continental at or near Caruthersville, Missouri, and all Related Assets.

   G.   "Continental" means defendant Continental Grain Company and includes its successors and assigns, their subsidiaries, divisions, groups, partnerships and joint ventures, affiliates, directors, officers, managers, agents and employees.

   H.   "Chicago port elevator" means the river elevator operated by Continental (also known as "Chicago B") at or near Chicago, Illinois, and all Related Assets.

   I.   "Divest" means to sell or transfer a defendant's rights in property that it owns, or to assign or sublease a defendant's rights in property that it leases or rents.

   J    "East Dubuque river elevator" means the river elevator operated by Cargill at or near East Dubuque, Illinois, and all Related Assets.

K.  "Grain" means corn, wheat and other grains, and soybeans and other oilseeds, in their unprocessed, commodity form.

L.  "Lockport river elevator" means the river elevator operated by Continental at or near Lockport, Illinois, and all Related Assets.

M  "Morris river elevator" means the river elevator operated by Cargill at or near Morris, Illinois, and all Related Assets.

N.  "Person" means any natural person, corporation, association, firm or other business or legal entity

O.  "Property rights" means all legal rights possessed by defendants relating primarily to the use, control or operation of a specific river, rail or port elevator, including but not limited to: fee simple ownership rights, easements and all other real property rights for land, improvements and fixtures owned by that defendant; leasehold and rental rights for facilities that are leased or rented to that defendant, including all renewal or option rights; personal property ownership rights for equipment and other personal property owned by that defendant and used in the operation of those facilities; stockholder interests; and contract rights.

P.  "Related Assets" means all real, personal and contract rights associated primarily with the operation of a particular river, rail or port elevator, including but not limited to: all bins, silos and other grain storage facilities, all improvements and equipment used for handling, receiving, unloading, weighing, sampling, grading, elevating, storing, drying, conditioning and loading grain; all of the real property on which the facility is located; all inventory, accounts receivable, pertinent correspondence, files, customer lists and information and advertising

materials relating to the facility; and all assignable contract rights specific to a facility with suppliers, customers and transportation firms for that specific facility.

Q. "Salina rail elevator" means the elevator with outbound rail capability (also known as "Salina East") operated by Continental at or near Salina, Kansas, and all Related Assets.

R. "Seattle port elevator" means the port elevator operated by Cargill at or near Seattle, Washington (commonly referred to as "Pier 86"), and all Related Assets.

S. "Standard Throughput Agreement" means an agreement that allows one grain company to move its grain through an elevator operated by another person, with unloading, storage, loading and ancillary services provided by the operator pursuant to terms, conditions and rates that are common in the grain industry.

T. "Stockton port elevator" means the port elevator operated by Continental at or near Stockton, California, and all Related Assets.

U "Tacoma port elevator" means the port elevator operated by Continental at or near Tacoma, Washington.

V. "Troy rail elevator" means the elevator with outbound rail capability operated by Continental at or near Troy, Ohio, and all Related Assets.

## III.

## APPLICABILITY

A. The provisions of this Final Judgment apply to the defendants, their successors and assigns, their subsidiaries, affiliates, directors, officers, managers, agents, and employees, and all other persons in active concert or participation with any of them who shall have received actual notice of this Final Judgment by personal service or otherwise

B. The pertinent defendant shall require, as a condition of the divestiture of the Assets, that the Acquirer agree to be bound by the provisions of this Final Judgment.

## IV.

## **DIVESTITURE OF ASSETS**

A. Cargill is hereby ordered and directed, within five (5) months from the date this Final Judgment is filed with the Court, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest all of its property rights in the East Dubuque river elevator and Morris river elevator to an Acquirer acceptable to the United States in its sole discretion. It is hereby ordered and directed, within six (6) months from the date this Final Judgment is filed with the Court, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest all of its property rights in the Seattle port elevator to an Acquirer acceptable to the United States in its sole discretion. The United States, in its sole discretion, may agree to an extension of the time period, and shall notify the Court in such circumstances.

B. Notwithstanding Section IV.A, the Acquirer of the Seattle port elevator may enter into a Standard Throughput Agreement with Cargill, or any joint venture involving the Tacoma elevator to which Cargill is a party (the "Cargill Joint Venture"), provided that: (1) the Acquirer has no interest in Cargill or the Cargill Joint Venture; (2) the throughput agreement gives Cargill or the Cargill Joint Venture no more rights concerning the operations of the facility than are commonly granted to sublessees in Standard Throughput Agreements; (3) and Cargill or the Cargill Joint Venture obtains continuing rights to move no more than 8.5 million bushels of grain and oilseeds combined in any given month through the Seattle port elevator.

C. Notwithstanding Section IV.A and IV.B, Cargill need not divest the Seattle port elevator if it does not buy, lease or otherwise acquire an interest in Continental's port elevator at or near Tacoma, Washington.

D. Continental is hereby ordered and directed, within five (5) months from the date this Final Judgment is filed with the Court, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest all of its property rights in the Lockport river elevator, Caruthersville river elevator, Salina rail elevator, Troy rail elevator, Beaumont port elevator, Stockton port elevator and Chicago port elevator to an Acquirer acceptable to the United States in its sole discretion. The United States, in its sole discretion, may agree to an extension of the time period, and shall notify the Court in such circumstances.

E. Unless the United States consents in writing, the divestiture pursuant to Section IV or by trustee appointed pursuant to Section V of this Final Judgment, shall include the entire Assets defined above (as qualified by Section IV.B and IV.C). Divestiture shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Assets can and will be operated by the Acquirer as a viable, ongoing business. Divestiture of the Assets, whether pursuant to Section IV or Section V of this Final Judgment, shall be made to an Acquirer for whom it is demonstrated to the sole satisfaction of the United States that: (1) the purchase is for the purpose of using the Asset to compete effectively in the grain business, (2) the Acquirer has the managerial, operational, and financial capability to use the Asset to compete effectively in the grain business; and (3) none of the terms of any agreement between the Acquirer and defendant(s) give defendant(s) the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability or incentive of

the Acquirer to compete effectively. Moreover, the United States must be satisfied, in its sole discretion, that any Standard Throughput Agreement that may be negotiated between Cargill or the Cargill Joint Venture and the Acquirer of the Seattle port elevator: (1) would leave the Acquirer with sufficient capacity for it to be a viable and effective competitor for the purchase of corn and soybeans in the Pacific Northwest draw area; and (2) would not adversely affect the Acquirer's ability or incentives to compete vigorously for the origination of corn and soybeans in the Pacific Northwest draw area, by raising the Acquirer's costs, lowering its efficiency, or otherwise interfering in the ability or incentive of the Acquirer to compete effectively

    F.    In accomplishing the divestiture ordered by this Final Judgment, defendants shall make known, by usual and customary means, the availability of the Assets. Defendants shall provide any person making inquiry regarding a possible purchase a copy of the Final Judgment. The pertinent defendant shall also offer to furnish to any prospective purchaser, subject to customary confidentiality assurances, all information regarding the Assets customarily provided in a due diligence process, except such information subject to attorney client privilege or attorney work product privilege. The pertinent defendant shall make available such information to the United States at the same time that such information is made available to any other person. The pertinent defendant shall permit prospective purchasers of the Assets to have reasonable access to personnel and to make such inspection of physical facilities and any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

    G.    Defendants shall not interfere with any negotiations by the Acquirer to employ any employee whose primary responsibility involves the use of the Assets.

H    Defendants shall take all reasonable steps to accomplish the prompt divestitures contemplated by this Final Judgment. Defendants shall not take any action other than in the ordinary course of business that will impede in any way the operation of the Assets.

I    Cargill shall not purchase, lease or acquire any interest in the Lockport river elevator, Caruthersville river elevator, Salina rail elevator, Troy rail elevator, Beaumont port elevator, Stockton port elevator or Chicago port elevator, or any interest in the river elevator at or near Birds Point, Missouri (in which Continental formerly owned a minority interest, and had a right of first refusal to purchase grain). If another firm acquires the Tacoma port elevator pursuant to a right of first refusal (and Cargill therefore retains the Seattle port elevator), Cargill shall not subsequently purchase or lease the Tacoma port elevator. If another firm acquires the Tacoma port elevator pursuant to a right of first refusal, Cargill shall not subsequently acquire any other interest in that facility (including a joint venture interest) without the written consent of the United States

J.    Cargill shall enter into a throughput agreement that makes one-third (1/3) of the daily loading capacity at its river elevator located at or near Havana, Illinois, or one barge-load per day, whichever is greater, to an independent grain company acceptable to the United States in its sole discretion (the "Havana Throughput Agreement"). Daily loading capacity shall be the capacity registered with the CBOT. The independent grain company that obtains the throughput right from Cargill (the "third party") must be qualified under CBOT rules and regulations to make delivery of at least one barge-load of corn and soybeans per day for the settlement of CBOT corn and soybean futures contracts, and must agree to register that capacity at the Havana facility with the CBOT.

The Havana Throughput Agreement shall allow the third party to use its share of the loading capacity at the Havana facility to transload grain from trucks onto barges for commercial purposes unrelated to futures contract deliveries, as well as to make deliveries under CBOT futures contracts. Cargill shall not be obligated by this Final Judgment to provide storage services to the third party in excess of the storage services required to accommodate the transloading of grain shipments from trucks to barges. Cargill's load-out fees, and its fees for any storage services that Cargill elects to provide for storage in excess of twenty-four hours from the time of truck unload to barge loading, may not exceed the load-out fees and daily storage rates published in applicable CBOT tariffs.

As part of the Havana Throughput Agreement, any dispute or disagreement between Cargill and the third party arising from or relating to the throughput agreement or the third party's use of Cargill's loading capacity at Havana shall be submitted, governed, and resolved in accordance with the arbitration rules of the CBOT to the extent such dispute or disagreement falls within the jurisdiction of the CBOT Arbitration Committees. To the extent such dispute or disagreement does not fall within CBOT jurisdiction, such dispute or disagreement shall be submitted, governed and resolved in accordance with the arbitration rules of the National Grain and Feed Association, or other arbitration body that is mutually agreed upon by Cargill and the third party  Cargill shall abide by the decisions of such arbitrators

Cargill shall enter into the Havana Throughput Agreement within five (5) months from the date this Final Judgment is filed with the Court, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later. The United States, in its sole discretion, may agree to an extension of the time period, and shall notify the Court in such

circumstances. If Cargill has not entered into a Havana Throughput Agreement within this time period, a trustee shall be appointed to satisfy this requirement pursuant to the same conditions as are set forth in Section V

## V.

## APPOINTMENT OF TRUSTEE

A. In the event that Cargill has not divested the East Dubuque river elevator, Morris river elevator or Seattle port elevator, or entered into the Havana Throughput Agreement, to the extent required by Section IV of the Final Judgment within the time period specified therein, or that Continental has not divested the Lockport river elevator, Caruthersville river elevator, Salina rail elevator, Troy rail elevator, Beaumont port elevator, Stockton port elevator or Chicago port elevator, to the extent required by Section IV of the Final Judgment, within the time period specified, it shall notify the United States of that fact in writing. In that event, and upon application of the United States, the Court shall appoint a trustee selected by the United States to effect the divestiture of the Assets. Until such time as a trustee is appointed, defendants shall continue their efforts to effect the divestiture as specified in Section IV.

B. After the appointment of a trustee becomes effective, only the trustee shall have the right to divest the Assets. The trustee shall have the power and authority to accomplish the divestiture at the best price then obtainable upon a reasonable effort by the trustee, subject to the provisions of Sections IV, V and VIII of this Final Judgment, and shall have such other powers as the Court shall deem appropriate. Subject to Section V. C. of this Final Judgment, the trustee shall have the power and authority to hire at the cost and expense of defendants any investment bankers, attorneys, or other agents reasonably necessary in the judgment of the trustee to assist in

the divestiture, and such professionals and agents shall be solely accountable to the trustee  The trustee shall have the power and authority to accomplish the divestiture at the earliest possible time to a purchaser acceptable to the United States in its sole discretion, and shall have such other powers as this Court shall deem appropriate  Defendants shall not object to a sale by the trustee on any grounds other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI of this Final Judgment.

    C.    The trustee shall serve at the cost and expense of the pertinent defendant, on such terms and conditions as the Court may prescribe, and shall account for all monies derived from the sale of the Assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to the pertinent defendant and the trust shall then be terminated. The compensation of such trustee and that of any professionals and agents retained by the trustee shall be reasonable and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished.

    D.    The pertinent defendant shall use its best efforts to assist the trustee in accomplishing the required divestiture, including their best efforts to effect all regulatory approvals and its best efforts to obtain any necessary consent of any persons from whom they lease the Assets  The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of, and relating to, the Assets, and the pertinent defendant shall develop financial or

other information relevant to such Assets customarily provided in a due diligence process as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture. The pertinent defendant shall permit any prospective Acquirer of the Assets to have reasonable access to personnel and to make such inspection of physical facilities and any and all financial, operational, or other documents and other information as may be relevant to the divestitures required by this Final Judgment.

E. After its appointment, the trustee shall file monthly reports with the parties and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment; provided, however, that to the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Assets, and shall describe in detail each contact with any such person during that period. The trustee shall maintain full records of all efforts made to divest the Assets. If the trustee has not accomplished such divestiture within six (6) months after its appointment, the trustee shall thereupon promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations; provided, however, that to the extent such reports contain information that the trustee deems confidential,

such reports shall not be filed in the public docket of the Court.  The trustee shall at the same time furnish such report to the parties, who shall each have the right to be heard and to make additional recommendations consistent with the purpose of the trust.  The Court shall thereafter enter such orders as it shall deem appropriate in order to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI.

## NOTIFICATION

A.   Within two (2) business days following execution of a definitive agreement with respect to any of the Assets, the pertinent defendant or the trustee, whichever is then responsible for effecting the divestiture required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment.  If the trustee is responsible, it shall similarly notify the pertinent defendant.  The notice shall set forth the details of the proposed transaction and list the name, address, and telephone number of each person not previously identified who offered to, or expressed an interest in or desire to, acquire any ownership interest in the Assets, together with full details of the same.  Within fifteen (15) calendar days after receipt of the notice, the United States may request from the pertinent defendant, the proposed purchaser, or any third party additional information concerning the proposed divestiture, the proposed purchaser, and any other potential purchaser.  The pertinent defendant or the trustee shall furnish the additional information within fifteen (15) calendar days of the receipt of the request.  Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after receipt of the additional information by the United States,

whichever is later, the United States shall notify in writing the pertinent defendant and the trustee, if there is one, whether or not it objects to the proposed divestiture. If the United States notifies in writing the pertinent defendant and the trustee, if there is one, that it does not object, then the divestiture may be consummated, subject only to the pertinent defendant's limited right to object to the sale under Section V. B. Absent written notice that the United States does not object to the proposed purchaser or upon objection by the United States, a divestiture proposed under Section IV or V may not be consummated. Upon objection by a defendant under Section V.B., the proposed divestiture under Section V shall not be accomplished unless approved by the Court.

      B.    Twenty (20) calendar days from the date of the filing of this Final Judgment, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or V, each defendant shall deliver to the United States a written affidavit as to the fact and manner of compliance with Section IV or V of this Final Judgment. Each such affidavit shall include, for each person who during the preceding thirty (30) calendar days made an offer, expressed an interest or desire to acquire, entered into negotiations to acquire, or made an inquiry about acquiring any ownership interest in all or any portion of the Assets, the name, address, and telephone number of that person and a detailed description of each contact with that person during that period. Each such affidavit shall also include a description of the efforts that the pertinent defendant has taken to solicit an Acquirer for the relevant Assets and to provide required information to prospective Acquirers including the limitations, if any, on such information. Assuming that the information set forth in the affidavit is true and complete, any objection by the United States to the information provided by the defendants, including

-15-

limitations on information, shall be made within fourteen (14) calendar days of receipt of such affidavit. Until one year after each defendant has completed such divestitures, that defendant shall maintain full records of all efforts made to divest all or any portion of the Assets.

## VII.

## FINANCING

Defendants shall not finance all or any part of any purchase of the Assets made pursuant to Sections IV or V of this Final Judgment. With respect to Assets leased by a defendant, however, the pertinent defendant will not violate this condition if: (1) the lessor holds the pertinent defendant responsible for lease payments under an assignment or sublease of the defendant's leasehold interests; or (2) the pertinent defendant makes up any shortfall between its lease payment obligations and the lease payments negotiated by the person to whom it assigns or subleases its leasehold interests.

## VIII.

## HOLD SEPARATE AND PRESERVATION OF ASSETS REQUIREMENTS

Unless otherwise indicated, from the date of filing of this proposed Final Judgment with the Court and until the divestitures required by Sections IV.A, IV D and/or V of the Final Judgment, and the execution of the Havana Throughput Agreement required by Section IV.J, have been accomplished:

A. Subject to *force majeure*, defendants shall: (1) take all steps necessary to assure that the Assets and Cargill's Havana river elevator are maintained as separate, distinct and salable assets; and extend all reasonable efforts to maintain these facilities in a condition that makes

-16-

them usable as grain elevators; (2) not sell, assign, transfer, or otherwise dispose of these facilities, or pledge them as collateral for loans, except in accordance with the Final Judgment; (3) take all steps necessary to preserve these facilities in a state of repair equal to their current state of repair, ordinary wear and tear excepted; (4) take all steps necessary to preserve the documents, books, customers lists and records relating to these facilities; (5) refrain from taking any actions that would jeopardize the sale of these facilities; and (6) continue to operate these facilities as grain elevators. Notwithstanding the foregoing: (a) if Continental's lease of the Salina rail elevator expired on or before April 30, 1999 and was not renewed, that facility shall not be subject to this section of the Final Judgment; and (b) if Cargill's lease of the East Dubuque river elevator expires prior to divestiture, Cargill shall not thereafter be subject to the provisions of this section if it has offered to extend the lease at rates and conditions substantially similar to the rates and conditions in its current lease, and the lessor has rejected that offer.

B   Except in the ordinary course of business or as is otherwise consistent with this Final Judgment, defendants shall not hire and shall not transfer or terminate, or alter, to the detriment of any employee, any current employment or salary agreements for any employees who on June 24, 1999 worked at any of the Assets, unless such individual has a written offer of employment from a third party for a like or better position.

C   Until such time as the Assets are divested: William F Winnie shall manage the Beaumont port elevator, Caruthersville river elevator, Chicago port elevator, Lockport river elevator, Stockton port elevator and Troy rail elevator; Peter Reed shall manage the East Dubuque river elevator; Sharon Spies shall manage the Morris river elevator; and Donald Vogt shall manage the Seattle port elevator. These individuals shall have complete managerial

responsibility for the Assets, subject to the provisions of the Final Judgment. In the event that these individuals are unwilling or unable to perform these duties, defendants shall appoint, subject to the United States' approval, a replacement acceptable to the United States within ten (10) working days  Should defendants fail to appoint a replacement acceptable to the United States within ten (10) working days, the United States may appoint a replacement

D.   Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestiture pursuant to the Final Judgment to a suitable Acquirer.

E   Continental shall operate the Lockport river elevator, Caruthersville river elevator, Troy rail elevator, Beaumont port elevator, Stockton port elevator and Chicago port elevator independently from and in competition with Cargill. Defendants shall not implement any non-compete agreements until all of the Assets have been divested. The term of any such non-compete agreement shall not be more than three (3) years.

## IX.

## COMPLIANCE INSPECTION

For the purpose of determining or securing compliance with this Final Judgment, and subject to any legally recognized privilege, from time to time:

A   Duly authorized representatives of the United States, including consultants and other persons retained by the United States, shall, upon the written request of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants made to their principal offices, be permitted

  1. access during office hours to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of defendants, which may have counsel present, relating to any matters contained in this Final Judgment; and

  2. subject to the reasonable convenience of defendants and without restraint or interference from them, to interview either informally or on the record, directors, officers, employees, and agents of defendants, which may have counsel present, regarding any such matters.

 B. Upon the written request of the Assistant Attorney General in charge of the Antitrust Division, made to defendants at their principal offices, defendants shall submit written reports, under oath if requested, with respect to any of the matters contained in this Final Judgment as may be requested.

 C. No information nor any documents obtained by the means provided in Sections VIII or IX shall be divulged by any representative of the United States to any person other than a duly authorized representative of the Executive Branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

 D. If at the time information or documents are furnished by a defendant to the United States, such defendant represents and identifies in writing the material in any such information or documents for which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and defendant marks each pertinent page of such material, "Subject to

claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give ten (10) calendar days' notice to defendant prior to divulging such material in any legal proceeding (other than a grand jury proceeding) to which defendant is not a party

## X.

## RETENTION OF JURISDICTION

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction, implementation, or modification of any of the provisions of this Final Judgment, for the enforcement of compliance herewith, and for the punishment of any violations hereof

## XI.

## TERMINATION OF PROVISIONS

Unless this Court grants an extension, this Final Judgment will expire on the tenth anniversary of the date of its entry.

## XII.

## PUBLIC INTEREST

Entry of this Final Judgment is in the public interest

Dated: June 29, 2000

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C § 16

Gladys Kessler
United States District Judge

-20-